THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICHAEL C. EVANS, in his capacity as Chairman of the Snohomish Tribe of Indians, and THE SNOHOMISH TRIBE OF INDIANS,<br><br>                    Plaintiffs,<br><br>          v.<br><br>SECRETARY KENNETH SALAZAR, THE UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF INDIAN AFFAIRS, OFFICE OF FEDERAL ACKNOWLEDGMENT, and THE UNITED STATES OF AMERICA,<br><br>                    Defendants. | Case No. C08-0372-JCC<br><br>ORDER |

This matter comes before the Court on the parties' cross-motions for summary judgment (Dkt. Nos. 94, 111) and Defendants' motion to strike the declaration of Steven L. Austin (Dkt. No. 100). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary, grants Defendants' motion to strike, denies Plaintiffs' motion for summary judgment, and grants Defendants' motion for summary judgment for the reasons explained herein.

## I.       BACKGROUND

This case arises out of a decision by the Department of Interior ("Department") to deny

1 an Indian group's petition to become a federally acknowledged tribe. Plaintiffs—the
2 Snohomish Tribe of Indians and its chairman Michael C. Evans—claim to be the successor to
3 the historical Snohomish tribe from the Puget Sound region of Western Washington. In 1855,
4 the Snohomish tribe signed the Treaty of Point Elliott, which established the Tulalip
5 reservation. Over the next several years, a substantial portion of the Snohomish tribe moved
6 onto the Tulalip reservation ("on-reservation Snohomish"), and although other tribes moved
7 there as well, the Snohomish remained the largest group. Plaintiffs' members are descendants
8 of Indian women who married white settlers during this period, but Plaintiffs' ancestors never
9 moved onto the reservation. In 1926, a group consisting of both on- and off-reservation
10 Snohomish created an organization that pursued treaty claims on behalf of Snohomish
11 descendants ("1926 organization"). Many of Plaintiffs' ancestors belonged to this organization,
12 which remained active until at least 1935. That same year, the various tribes residing at
13 Tulalip, including the Snohomish, elected to reorganize under a single tribal government
14 ("Tulalip Reorganization"). The resulting entity, known as the "Tulalip Tribes," has since been
15 federally acknowledged but has never included any of Plaintiffs' ancestors. Plaintiffs
16 characterize the 1935 Tulalip Reorganization as having caused a "rift" between the on-
17 reservation and off-reservation Snohomish. They insist that the 1926 organization was the
18 official governing body of the Snohomish tribe and that its off-reservation members—
19 including Plaintiffs' ancestors—continued to conduct tribal affairs after the on-reservation
20 members "defected" to the Tulalip Tribes. Plaintiffs formally incorporated in 1950, creating
21 the entity that continues to the present, though they describe this event as simply a
22 "reorganization" of the 1926 organization. Plaintiffs, in effect, argue that they represent the
23 "true" Snohomish tribe.

24      Federal acknowledgment establishes a government-to-government relationship between
25 the United States and the acknowledged tribe. 25 C.F.R. § 83.2. An acknowledged tribe
26 becomes a domestic dependent nation with inherent sovereign authority independent of the

ORDER, C08-0372-JCC
PAGE - 2

1  United States and independent of the state in which it is located. *Cherokee Nation v. Georgia*,

2  30 U.S. 1 (1831). However, "an American Indian tribe does not exist as a legal entity unless

3  the federal government decides that it exists." *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1273

4  (9th Cir. 2004). Acting pursuant to congressional authorization, the Department has

5  promulgated acknowledgment regulations to define what constitutes an Indian tribe. *See James*

6  *v. U.S. Dept. of Health and Human Services*, 824 F.2d 1132, 1137–38 (D.C. Cir. 1987); *Miami*

7  *Nation of Indians of Indiana, Inc. v. Babbit*, 887 F. Supp. 1158, 1165 (N.D. Ind. 1995).

8        To become an acknowledged tribe under the current regulations, a petitioning group

9  must satisfy seven mandatory criteria: (a) the group has been identified as an American Indian

10  entity on a substantially continuous basis since 1900, (b) a predominant portion of the group

11  comprises a distinct community and has existed as a community from historical times until the

12  present, (c) the group has maintained political influence or other authority over its members as

13  an autonomous entity from historical times until the present, (d) the group has a governing

14  document, (e) the group's membership is composed of individuals who descend from a

15  historical Indian tribe, (f) the group's membership is composed of persons who are not

16  members of an acknowledged tribe, and (g) the group's status as a tribe is not precluded by

17  congressional legislation. 25 C.F.R. § 83.7. The acknowledgment regulations place the burden

18  on a petitioner to prove each criterion with evidence that "establishes a reasonable likelihood

19  of the validity of the facts relating to that criterion." *Id.* § 83.6(d).

20  **II.    PROCEDURAL HISTORY**

21        Plaintiffs first requested federal acknowledgment in 1975. The Department

22  promulgated the acknowledgment regulations in 1978 and, after reviewing Plaintiffs' petition

23  under those standards, issued a Proposed Finding against acknowledgment in 1983. 48 Fed.

24  Reg. 15,540 (April 11, 1983). The Department concluded that Plaintiffs had failed to meet four

25  of the seven mandatory criteria. Specifically, it determined that the Plaintiffs' group had not

26  been identified as an American Indian entity before 1950 (criterion 83.7(a)), that it had never

1   formed a distinct community (criterion 83.7(b)), that it had never exercised significant political

2   authority over its members (criterion 83.7(c)), and that a significant portion of its membership

3   (41 percent) could not establish Snohomish descent (criterion 83.7(e)). At Plaintiffs' request,

4   the Department extended the comment period indefinitely. In 1994, the Department revised its

5   acknowledgment regulations, changing a number of procedural requirements but leaving the

6   substantive criteria largely unaltered. Plaintiffs elected to proceed under these revised

7   regulations, and in 1999 they submitted their comments to the Proposed Finding along with

8   additional evidence. The Department reviewed these submissions and issued its Final

9   Determination in 2003. 68 Fed. Reg. 68942 (Dec. 10, 2003). The Department found that an

10  additional ten percent of the group's members had demonstrated Snohomish descent, but

11  concluded that this still failed to meet the tribal-descent criterion. Its other findings remained

12  unchanged. Because Plaintiffs did not meet four of the seven mandatory criteria, the

13  Department denied their petition for acknowledgment. This suit followed.

14          In Count One of the Complaint, Plaintiffs challenge the Final Determination as

15  arbitrary and capricious under the Administrative Procedures Act ("APA"). In Count Two,

16  they claim that the Department violated their procedural-due-process rights by failing to

17  evaluate their petition under the proper standards. In Count Three, they claim that the

18  Department discriminated against them on the basis of race and gender, thereby violating their

19  equal-protection rights. Plaintiffs now ask this Court to set aside the agency decision and

20  declare that the federal government acknowledges them as an Indian tribe. Because the Court

21  concludes that the Department's evaluation was neither arbitrary nor capricious for three of the

22  contested criteria, it rejects Plaintiffs' APA claim. The Court also concludes that the

23  Department applied the proper standards and did not discriminate against Plaintiffs in any way.

24  Accordingly, the Court rejects Plaintiffs' due-process and equal-protection claims.

25  **III.   APPLICABLE LAW**

26          **A.  Summary Judgment**

ORDER, C08-0372-JCC
PAGE - 4

1    Summary judgment is appropriate if there is no genuine issue as to any material fact

2   and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A

3   material fact is one that "might affect the outcome of the suit under the governing law," and an

4   issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the

5   nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving

6   party bears the initial responsibility of informing the Court of the basis for its motion and

7   identifying those portions of the record that demonstrate the absence of a genuine issue of

8   material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To defend against the

9   motion, the nonmoving party must then establish a genuine issue for trial by pointing to

10   specific evidence along with its location in the record. *Orr v. Bank of Am., NT & SA*, 285 F.3d

11   764, 774–75 (9th Cir. 2002).  A moving party is entitled to judgment as a matter of law if the

12   nonmoving party fails to make a sufficient showing on an element essential to its case and with

13   respect to which it bears the burden of proof. *Celotex*, 477 U.S at 322–23.

14        **B.  Standard of Review**

15        Under the APA, a court may set aside an agency decision only if it is found to be

16   "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5

17   U.S.C. § 706(2)(A). An agency decision is "arbitrary and capricious" if the agency (1) relied

18   on a factor that Congress did not intend it to consider, (2) failed to consider an important factor

19   or aspect of the problem, (3) failed to articulate a rational connection between the facts found

20   and the conclusions made, (4) supported the decision with a rationale that runs counter to the

21   evidence or is so implausible that it could not be ascribed to a difference in view or the product

22   of agency expertise, or (5) made a clear error in judgment. *Cal. Energy Comm'n v. Dep't of*

23   *Energy*, 585 F.3d 1143, 1150–51 (9th Cir. 2009). Agency action is valid if the agency

24   considered the relevant factors and articulated a rational connection between the facts found

25   and the choices made. *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010).

26        A reviewing court may not reweigh the evidence before the agency. *See Lockheed*

ORDER, C08-0372-JCC
PAGE - 5

1    *Shipbuilding v. Director, OWCP*, 951 F.2d 1143, 1146 (9th Cir. 1991). The agency's factual

2    findings are reviewed for substantial evidence and will not be disturbed unless the evidence

3    presented would compel a reasonable finder of fact to reach a contrary result. *Herrera v. U.S.*

4    *Citizenship & Immigration Servs.*, 571 F.3d 881, 885 (9th Cir. 2009). If the evidence contained

5    in the administrative record is susceptible to more than one rational interpretation, a reviewing

6    court may not substitute its judgment for that of the agency. *Hensala v. Dep't of Air Force*, 343

7    F.3d 951, 955–56 (9th Cir. 2003). An agency's interpretation of its own regulations is

8    controlling unless "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519

9    U.S. 452, 461 (1997).

10   **IV.    DISCUSSION**

11          **A.    Motion to Strike**

12          Before reaching Plaintiffs' substantive claims, the Court must determine the scope of

13   the record. The Department moves to strike the declaration of Steven L. Austin, arguing that it

14   is outside the administrative record and therefore beyond the scope of judicial review. Judicial

15   review of agency action is generally limited to review of the administrative record. *Animal*

16   *Defense Council v. Hodel,* 840 F.2d l432, 1436 (9th Cir.1988). The Ninth Circuit allows

17   consideration of extra-record materials in four circumstances: (1) if necessary to determine

18   whether the agency has considered all relevant factors and has explained its decision, (2) when

19   the agency has relied on documents not in the record, (3) when supplementing the record is

20   necessary to explain technical terms or complex subject matter, and (4) when the plaintiffs

21   make a showing of agency bad faith. *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 665

22   (9th Cir. 1998). None of those circumstances apply here.

23          Plaintiffs assert that the declaration helps to explain intermarriage with whites, which

24   they argue is a complex anthropological concept. The proper role of such extra-record

25   declarations is not to provide a subjective analysis of the context and significance of complex

26   concepts, but rather to provide objective definitions and explanations of subject matter with

1   which a limited group of specialists has any familiarity. An Anthropologist such as Professor

2   Austin can provide the Court with insightful analysis about context and history interracial

3   marriage, but the Court does not need assistance understanding what the concept means. Thus,

4   Professor Austin's declaration is not a proper exception to the rule that this Court should not

5   consider extra-record evidence.

6       Plaintiffs also argue for a fifth exception that would allow extra-record evidence to

7   show "contemporaneous constructions" of the agency's regulations. The Ninth Circuit does not

8   recognize this exception, but even if it did, Dr. Austin's declaration provides no insight into the

9   Department's interpretations beyond what is already contained in the record. The declaration is

10  nothing more than expert testimony criticizing the weight that the Department gave to

11  particular pieces of evidence. It is therefore stricken.

12      **B.    "Identification" Criterion**

13      Criterion 83.7(a) requires proof that "[t]he petitioner has been identified as an

14  American Indian entity on a substantially continuous basis since 1900." 25 C.F.R. § 83.7(a).

15  Identifications must come from a source "other than the petitioner itself or its members." *Id.*

16  The Department states that its practice is to require at least one identification every ten years.

17  (Dkt. No. 94 at 16.) Plaintiffs challenge the Department's conclusion that they failed to meet

18  this criterion for the years 1900 through 1949.

19      Plaintiffs first argue that the Department failed to take into account the historical

20  context of the Snohomish tribe in the period between 1900 and 1934. Specifically, they

21  contend that before the 1935 Tulalip Reorganization, the "historical" Snohomish tribe

22  consisted of individuals living both on and off the reservation, so any reference to a

23  "Snohomish tribe" before 1935 would qualify as an external identification of their ancestors.

24  There is no dispute that some Snohomish tribal members lived outside the reservation. There is

25  also no dispute that Plaintiffs' ancestors included individuals of Snohomish descent who lived

26  outside the reservation. However, it does not follow that Plaintiffs' ancestors—by virtue of

1   their descent—were necessarily Snohomish *tribal members*. Indeed, the Department found that

2   Plaintiffs' ancestors, with few exceptions, had not maintained ties with the historical

3   Snohomish tribe. (*See* FD Summ. at 22.)

4        The administrative record shows that the Department thoroughly considered the

5   historical circumstances and explained its decision.  Plaintiffs cite two letters as evidence that

6   their ancestors "intermingled" with the on-reservation Snohomish. (Dkt. No. 111 at 24.) The

7   Department addressed both of these in the Final Determination and rationally concluded that

8   they tended to *disprove* Plaintiffs' theory. (FD at 3–4, 16.) Language from the letters and the

9   responses thereto suggest that Plaintiffs' ancestors—whom the authors referred to as "citizen

10  Indians"—did not associate with the on-reservation Snohomish and had in fact integrated into

11  non-Indian communities. (*Id.*)

12       Furthermore, the Department found no evidence that the Tulalip Reorganization "split"

13  the historical Snohomish tribe into separate on- and off-reservation factions, as Plaintiffs

14  contend. (FD at 27–30.) In fact, the Department noted many conspicuous gaps in the record

15  where one would expect to see evidence of such a split. For example, there was no evidence of

16  any opposition to the Tulalip Reorganization from any off-reservation Snohomish group, even

17  though an off-reservation Snoqualmie group had opposed the move. (FD at 29–30.) Minutes

18  from the 1926 organization's meetings appear consistently in the record until the year 1935,

19  after which none can be found. (*See* FD at 56.) Following reorganization, the Tulalip Tribes

20  sent letters to off-reservation Indian groups in order to clear up dual-enrollment issues, but no

21  letters were sent to any off-reservation Snohomish group. (FD at 31–32.) After considering all

22  of the available evidence, the Department decided that pre-1935 references to the "Snohomish

23  tribe" did not constitute external identifications of Plaintiffs' ancestors, and it articulated a

24  rational explanation for doing so. Its decision was neither arbitrary nor capricious.

25       Plaintiffs also argue that the Department failed to consider the effect that the Tulalip

26  Reorganization, the Great Depression, and World War II would have on external

ORDER, C08-0372-JCC
PAGE - 8

1    identifications between 1935 and 1949. They contend that these events are responsible for a

2    decline in tribal activity and caused confusion over whether the "Snohomish tribe" had been

3    absorbed into the newly formed Tulalip Tribes. The Final Determination shows that the

4    Department took these events into consideration and rationally concluded that they did not

5    warrant a departure from the normal identification requirements. The Department found

6    identifications of other Indian entities during this time period, despite the economic and

7    wartime circumstances. (FD at 29–32.) The Department also addressed the evidence of

8    confusion and found that it further undermined the theory of a distinct off-reservation entity.

9    (FD at 28.) In a series of letters, the Internal Revenue Service mistook the 1926 organization

10   for the Snohomish tribe itself, but the Tulalip superintendent resolved this confusion in 1938

11   by explaining that the 1926 "corporation" had not held any meetings in two or three years. (*Id.*)

12   This is particularly damaging to Plaintiffs' theory that the 1926 organization represented the

13   governing body of the historical Snohomish tribe and continued to exist after 1935. The

14   historical circumstances cannot account for the total absence of external identifications during

15   this period, and it was not arbitrary for the Department to so conclude.

16        Next, Plaintiffs argue that the Department ignored three pieces of evidence indicating

17   that an off-reservation Snohomish group continued to hold tribal-council meetings through

18   1949. The first—a 1975 interview—is simply a self-identification by a group member, so it

19   cannot be used to satisfy criterion 83.7(a). The second—a 1950 letter—references only events

20   from that year, and therefore falls outside the disputed timeframe. The third—a 1934 letter—is

21   addressed in the Final Determination, and although the letter references the 1926 organization,

22   it does not indicate that Tulalip officials viewed it as an off-reservation Snohomish entity. (FD

23   at 26–27.) The Department considered the relevant evidence.

24        Finally, Plaintiffs argue that the Department contravened the regulations by construing

25   fluctuations in tribal activity against them. Plaintiffs appear to be referring to 25 C.F.R.

26   § 83.6(e), which states that "[f]luctuations in tribal activity during various years shall not in

ORDER, C08-0372-JCC
PAGE - 9

1   themselves be a cause for denial of acknowledgment under these criteria." However, the
2   Department correctly points out that this provision applies only to the "community" and
3   "political authority" criteria; it does not affect the "identification" analysis under criterion
4   83.7(a). *See* 25 C.F.R. § 83.6(e). Nevertheless, criterion 83.7(a) states that "[e]vidence that the
5   group's character as an Indian entity has from time to time been denied shall not be considered
6   to be conclusive evidence that this criterion has not been met." Even so, the Department did
7   not base its decision merely on periodic denials of the group's identity. Plaintiffs failed to
8   produce a single external identification from the first half of the twentieth century, and the
9   Department therefore concluded that Plaintiffs had not been identified as an American Indian
10  entity on a "substantially continuous" basis. This conclusion was neither arbitrary nor
11  capricious.

12          C.      **"Community" Criterion**

13          Criterion 83.7(b) requires proof that "[a] predominant portion of the petitioning group
14  comprises a distinct community and has existed as a community from historical times until the
15  present." 25 C.F.R. § 83.7(b). A "community" is "any group of people which can demonstrate
16  that consistent interactions and significant social relationships exist within its membership and
17  that its members are differentiated from and identified as distinct from nonmembers." *Id.*
18  § 83.1. The regulations state that "community" is to be understood "in the context of the
19  history, geography, culture and social organization of the group." *Id.* Plaintiffs challenge the
20  Department's conclusion that they did not meet this criterion at any time between 1855 and the
21  present.

22          Plaintiffs set forth a laundry list of evidence that they claim the Department completely
23  ignored in its community analysis. That list includes (1) evidence of ancestral marriages, (2)
24  evidence of community participation by "collateral" relatives on the Tulalip reservation, (3) a
25  1987 Socio-Economic survey, (4) a Social Network survey, and (5) evidence of additional
26  group activities including annual meetings, cultural events, and fundraisers. A cursory review

1    of the Final Determination reveals that these claims are baseless.

2           The Department discussed at length the evidence of ancestral marriages and concluded

3    that it did not establish "community." (FD Summ. at 26–29.) Marriage patterns and familial

4    relationships are both relevant to the 83.7(b) analysis because they permit an inference that

5    individuals consistently interacted with one another. Plaintiffs offered a chart that purported to

6    show marriages between their ancestors and Snohomish tribal members or other Indians.

7    However, this evidence contained inconsistencies and included many individuals with no

8    descendants in the current group. (FD Summ. at 29.) In addition, most of the claimed

9    marriages lacked any supporting documentation and therefore could not be verified. (*Id.*) The

10   marriages that could be verified were almost exclusively between Plaintiffs' ancestors and non-

11   Indians (*Id.*), but such marriages do not constitute evidence of community under the

12   regulations. *See* 25 C.F.R. § 83.7(b)(1)(i). The Department did not ignore Plaintiffs' chart; it

13   simply concluded that it was unreliable.

14          As to the evidence of "collateral" relatives, Plaintiffs attempted to show that their

15   ancestors were related to the on-reservation Snohomish and were therefore part of the same

16   "community." They argue that the activities of these on-reservation Snohomish members

17   therefore qualify as evidence that their group has met criterion 83.7(b). Plaintiffs' ancestors

18   were certainly "related" to the on-reservation Snohomish insofar as they descended from a

19   common ancestor, but the Department determined that the familial relationships between the

20   groups were too distant to permit an inference of social interaction. (FD Summ. at 27.)

21   Therefore, absent evidence of actual interaction, the Department concluded that Plaintiffs had

22   failed to prove the existence of a "distinct community" before 1935. (*Id.*)

23          Plaintiffs are correct that the Department failed to consider the 1987 Socio-Economic

24   survey, but this is only because Plaintiffs never submitted it to the Department. The

25   administrative record reveals that Plaintiffs submitted a summary of the results, not the survey

26   itself. Without more, the Department had no way of conducting any meaningful evaluation of

ORDER, C08-0372-JCC
PAGE - 11

1    this evidence and therefore properly disregarded it. The Department nonetheless considered the

2    Social Network survey conducted by Dr. Helen Norton and ultimately rejected its conclusions.

3    (*See* FD at 66–69.) As the Final Determination points out, Dr. Norton's survey was plagued by

4    many glaring design flaws that prevented the Department from drawing any useful inferences

5    from the data. (FD at 67–69.) The Department therefore concluded that the survey was not a

6    legitimate instrument for measuring social interaction among Plaintiffs' members. (FD at 69.)

7         The Department considered the other activities cited by Plaintiffs and concluded that

8    they were not enough to establish the level of community necessary to satisfy criterion 83.7(b).

9    (*See* FD at 63–74.) The Final Determination points out that many of these events, such as the

10   powwows and naming ceremonies, did not begin until very recently and are mostly symbolic.

11   (FD at 70–71.) Only a small portion of the group's widely dispersed members attended such

12   events. (FD at 70–71.) The Department has shown that it thoroughly considered all of the

13   relevant evidence.

14        Plaintiffs next claim that the Department did not give proper weight to a substantial

15   body of evidence, including (1) a report by Dr. Norton, (2) interviews and affidavits of group

16   members describing their upbringing in Snohomish communities, (3) the formation of the 1926

17   organization, (4) the political activities of the Bishop family, and (5) evidence of funerals being

18   attended by both on- and off-reservation Snohomish. It bears repeating that a reviewing court

19   is not permitted to reweigh the evidence presented to an agency; as long as the agency

20   provided a rational explanation for its actions, the decision will be upheld. *See Lockheed*

21   *Shipbuilding v. Director, OWCP*, 951 F.2d 1143, 1146 (9th Cir. 1991).

22        The Department clearly articulated why it found the Norton report to be of little value.

23   The report hypothesized that children of pioneer men and Snohomish women were primarily

24   influenced by the Indian side of the family—and therefore maintained ties with the tribe—

25   because their white fathers had traveled to the area alone and had no family there. (FD at 40).

26   However, the Department found that these children were raised in predominantly white

ORDER, C08-0372-JCC
PAGE - 12

communities and that their Indian mothers did not have relatives in the area either. (FD at 40–41.) Because both parents had moved to a new area and had no relatives nearby, Dr. Norton's conclusion was merely speculative. The Department offered a rational explanation for discounting the Norton report and therefore did not act arbitrarily.

The Department also discussed the interviews and affidavits at length and found that they did not demonstrate the existence of a distinct community. (*See* FD at 56–61.) At the outset, the Department noted several factors that called their accuracy into question. Most of the interviews were conducted in the presence of a prominent group leader, which may have influenced the responses. (FD at 56.) Furthermore, all of the interview subjects were over age 60 at the time of their interview and were asked to recall events from their childhood. (FD at 57.) The Department further noted that some of the statements from the interviews and affidavits tended to refute the notion that a distinct community existed. For example, most of the interview subjects indicated that they had distanced themselves from the full-blood Indians in their neighborhoods and had instead associated with non-Indians. (FD at 58–59.) Nor did they describe any separate "mixed-blood" Indian community. (FD at 59.) Most of subjects denied having ever experienced discrimination on account of their Snohomish identity. (FD at 58–59.) The activities they described were mostly family or extended-family events, rather than tribal events. (FD Summ. at 32.) The Department concluded that this evidence did not satisfy criterion 83.7(b), and it fully explained its reasoning.

The Department also explained its reasons for concluding that the 1926 organization did not represent a "community." The record indicates that the organization was primarily involved in pursuing litigation, and it appears to have disbanded following an adverse court ruling in 1935. (FD at 52, 56.) The criteria for enrollment in the organization were vague, and its membership included people who could not demonstrate Snohomish ancestry. (FD at 52.) Those who enrolled became eligible to share in a potential monetary judgment, which may help to explain the group's diverse membership. (*See* PF at 24; FD at 102.) In fact, some

1    individuals joined after being turned down in other claims settlements. (FD at 52.) There was

2    even evidence that the on-reservation Snohomish members were becoming frustrated by the

3    inclusion of so many unfamiliar people. (FD at 53.) Based on this evidence, it was rational for

4    the Department to conclude that the organization was not evidence of a community.

5         The Department also explained why it gave little weight to the activities of Thomas and

6    William Bishop. (*See* FD at 49–52.) Thomas was an advocate for all landless Indians in

7    Washington State, regardless of tribal affiliation, and he never identified himself as a leader of

8    any Snohomish group. (FD at 49.) Although Plaintiffs identify the Chimacum area as being a

9    key Snohomish population center, the writings of Thomas Bishop make no mention of any

10   Snohomish community in Chimacum, despite mentioning other tribes in that area. (FD at 49.)

11   William Bishop was an off-reservation Snohomish who served as president of the 1926

12   organization, but beyond this had no involvement in Snohomish affairs. (FD at 50–51.) The

13   Department's conclusion that these facts did not demonstrate the existence of a Snohomish

14   community was neither arbitrary nor capricious.

15        The Department also acknowledged the fact that William Bishop's funeral in 1934 was

16   attended by William Shelton, an on-reservation Snohomish, and noted that Bishop's sons later

17   attended Shelton's funeral. (FD at 53.) However, this was virtually the only evidence that any

18   social relationships existed between Plaintiffs' ancestors and the on-reservation Snohomish.

19   The Department rationally concluded that these two funerals did not, by themselves, establish

20   that a "predominant portion" of the group existed as a distinct community in the years leading

21   up to the Tulalip Reorganization. Because the Department gave valid reasons for weighing the

22   evidence as it did, its actions were neither arbitrary nor capricious.

23        Plaintiffs next argue that there is no evidence to support the Department's findings that

24   the second- and third-generation mixed-blood Snohomish in the Chimacum area integrated into

25   the white community and that there was little contact between the four main Snohomish

26   population centers. In the Final Determination, the Department notes that the Chimacum

1   Snohomish spoke no language other than English, attended the same public schools as white

2   children, and did not belong to any predominantly Indian churches or other social institutions

3   that would distinguish them from the white community. (FD at 43–44.) Furthermore, women

4   as well as men from these later generations married non-Indians, indicating more integration

5   than the preceding generation, in which only women had married non-Indians. (FD at 44.)

6   With respect to the contact between locations, Plaintiffs presented no evidence that their

7   ancestors made any specific visits to other locations before 1915, and the Department noted the

8   significant time such trips would have required. (FD at 41.) Individuals from different

9   locations did not marry each other to any significant degree, and the Department noted that the

10  constant influx of non-Indians to the Chimacum area would give Plaintiffs' ancestors more

11  local options for social interaction. (FD at 44–45.) The Department found that contact between

12  the four Snohomish locations was therefore unlikely. Because the evidence presented does not

13  compel a contrary result, the Department's findings will not be disturbed.

14          Finally, in response to the Department's conclusion that the group's current members

15  do not form a community, Plaintiffs argue that it is arbitrary to require an Indian group to

16  demonstrate social interactions outside of the organization's official events. This, they claim,

17  ignores the cultural realities of landless tribes. However, the Department has the authority to

18  define what constitutes a "tribe," and it need not cater that definition to the cultural realities of

19  any particular group. The acknowledgment regulations represent a policy choice by the

20  Executive Branch to establish a government-to-government relationship with only those groups

21  that represent a distinct community. The regulatory definition of "community" includes both

22  "consistent interactions" and "significant social relationships," and the Department interprets

23  this to mean more than common attendance at organized events. Because this interpretation is

24  not plainly erroneous, it is controlling here. A landless group may find it difficult to maintain

25  social ties, but this does not exempt it from the "community" requirement.

26

ORDER, C08-0372-JCC
PAGE - 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

### D.    "Political Authority" Criterion

Criterion 83.7(c) requires proof that "[t]he petitioner has maintained political influence or authority over its members as an autonomous entity from historical times until the present." 25 C.F.R. § 83.7(c). Plaintiffs challenge the Department's conclusion that they did not meet this criterion at any time between 1855 and the present.

Plaintiffs fault the Department for failing to recognize the unique nature of Snohomish "authority." According to Plaintiffs, the Snohomish "historically had no 'government' as we understand the term to mean." (Dkt. No. 111 at 44.) Instead, they claim, Snohomish "political authority" has always consisted of "cultural preservation, education, and social interaction." (*Id.* at 40.) It is true that the exercise of political authority is to be understood "in the context of the history, geography, culture and social organization of the petitioning group." 25 C.F.R. § 83.1. However, this does not mean that any traditional group activities can be recast as examples of "authority." Plaintiffs' argument presupposes the existence of a quality specifically intended to distinguish tribes from non-tribes. In any event, however, the Department considered the political structure of the Snohomish tribe as it existed in 1855. The Department found that, although the tribe did not have strong central leadership, each village was largely autonomous and had its own chief. (FD at 81.) The Department looked for evidence of this type of organization among Plaintiffs' ancestors and found none. (*See* FD at 85.)

Plaintiffs next contend that the Department disregarded evidence of political authority for the years 1935 through 1949 simply because it was not documentary in nature. Plaintiffs submitted a number of interviews to show that the 1926 organization continued to exist and hold tribal council meetings after the Tulalip Reorganization. Plaintiffs correctly point out that nothing in the regulations *requires* the use of documentary evidence, and the Department has stated that "[p]ast decisions have used oral history extensively." 59 Fed. Reg. 9280, 9289 (Feb. 25, 1994). However, it is clear in this case that the Department thoroughly examined the

ORDER, C08-0372-JCC
PAGE - 16

1   interviews and found them to be lacking on their own merits. The Department pointed out that

2   only two members of the group remembered any meetings taking place during the relevant

3   period and that their memories were "fragmentary at best." (FD Summ. at 40.) One of these

4   members described the meetings as "a bunch of Indians [who] got together," but could not

5   recall any dates, times, locations, or topics discussed. (FD at 114.) The other member did not

6   claim to have actually attended the meetings. (FD Summ. at 40.) Plaintiffs offered no other

7   evidence of political authority for the years 1935 through 1949. The Department therefore

8   concluded that Plaintiffs failed to meet criterion 83.7(c) for that fifteen-year period, but not

9   because they lacked *documentary* evidence; Plaintiffs simply failed to meet their burden of

10  proof. It was not irrational for the Department to require stronger evidence than that which

11  Plaintiffs presented here.

12          Throughout their pleadings, Plaintiffs accuse the Department of subjecting their

13  petition to a higher burden of proof than the regulations prescribe. Although "conclusive

14  proof" is not required, the regulations place the burden on a petitioner to establish "a

15  reasonable likelihood of the validity of the facts." 25 C.F.R. § 83.6(d). The meaning of this

16  standard is far from obvious. However, in promulgating the acknowledgment regulations, the

17  Department explicitly rejected a "preponderance" standard and a "more-likely-than-not"

18  standard. *See* 59 Fed. Reg. at 9280–81. The Department indicated that a petitioner can fail to

19  meet a criterion if the evidence is "too fragmentary" or if the "level of evidence is [not] high

20  enough, even in the absence of negative evidence." *Id.* Though these statements offer only

21  minimal guidance, they suggest that the standard is not nearly as petitioner-friendly as

22  Plaintiffs claim. Plaintiffs specifically refer to it as a "preponderance standard" in their

23  complaint (Dkt. No. 1 at 19–20) and seem to suggest that if a petitioner comes forward with

24  any evidence at all, the burden shifts to the government to rebut that evidence. (*See* Dkt. No.

25  111 at 49; Dkt. No. 113 at 2, 20–21.) In other instances, they characterize the standard as

26  creating a presumption that a criterion is met, requiring the government to establish a

ORDER, C08-0372-JCC
PAGE - 17

1     reasonable likelihood that the facts do *not* exist. (*See* Dkt. No. 111 at 52; Dkt. No. 115 at 36.)

2     The burden is on a petitioner, however, to prove all of the criteria, not on the Department to

3     disprove them. Plaintiffs argue that the Department is required to resolve all ambiguities in

4     favor of acknowledgment (*see* Dkt. No. 115 at 15), but nothing in the regulations supports this

5     position. They further claim that the existence of evidence before and after a time period

6     establishes a "reasonable likelihood" that the criterion is met during the time period. (*Id.* at 22.)

7     The Department's comments indicate that this is exactly the kind of "fragmentary" evidence

8     that will fail under the "reasonable likelihood" standard. In light of the sparse record that

9     Plaintiffs have presented, particularly for the years 1935 through 1949, and given the presence

10    of contradictory evidence during the same time period, this Court cannot conclude that the

11    Department applied the evidentiary standard incorrectly.

12          Plaintiffs also argue that the Department improperly construed the group's claims

13    activities against it. There is nothing to suggest that the Department interpreted Plaintiffs'

14    claims activities as evidence that they *lacked* political authority; the Department simply

15    determined that claims activities alone could not satisfy criterion 83.7(c). (*See* FD at 123.) In

16    fact, the Department noted that claims activities *can* provide evidence of political authority in

17    some circumstances, and the Final Determination describes the nuanced analysis that the

18    Department conducts with respect to such activities. (*See* FD at 123.) Plaintiffs failed to

19    establish that their claims activities involved issues so important or controversial to the group

20    that the pursuit of such claims would necessarily entail the exercise of political authority. (FD

21    at 123.)

22          Plaintiffs further argue that, even if their claims activities are not evidence of political

23    authority, the Department still failed to consider the other functions listed in the group's

24    bylaws that are unrelated to claims. The Final Determination clearly discusses the various

25    social programs that the group has administered, including the distribution of food vouchers

26    and provision of foster care. (*See* FD Summ. at 44.) The Department found that only a small

1    portion of the group's membership took part in such programs. (*Id.*) It also noted the low

2    attendance figures for the group's primary political event—the annual meeting—and found

3    little evidence that the group's membership has influenced or been influenced by the tribal

4    council's decisions. (FD Summ. at 44–45.)

5          The balance of Plaintiffs' arguments concerning criterion 83.7(c) have already been

6    addressed in the "identification" and "community" discussions. Plaintiffs argue that they

7    should receive credit for the "political authority" exercised by on-reservation Snohomish

8    leaders before 1935, but the Department found that Plaintiffs' ancestors had not maintained ties

9    with this group. Plaintiffs also argue that various historical events—the Tulalip

10   Reorganization, the Great Depression, and World War II—are responsible for the evidentiary

11   gap between 1935 and 1950, but the Department determined that these historical factors could

12   not excuse a complete lack of evidence. Because the Department's explanations are equally

13   valid in the context of criterion 83.7(c), Plaintiffs' arguments fail here as well.

14         **E.    "Tribal Descent" Criterion**

15         Criterion 83.7(e) requires proof that "[t]he petitioner's membership consists of

16   individuals who descend from a historical Indian tribe." 25 C.F.R. § 83.7(e). Plaintiffs

17   challenge the Department's conclusion that they could not establish Snohomish descent for a

18   sufficient percentage of their membership. They argue that the Department failed to consider

19   documents in which the "Snohomish Tribal Committee" approves their ancestors' applications

20   for membership in the 1926 organization. The Department appears to concede that it did not

21   consider this evidence, stating that such evidence, by its very nature, does not indicate descent.

22   (*See* Dkt. No. 100 at 37.) However, the regulations state that evidence of descent includes

23   "[a]ffidavits of recognition by tribal elders, leaders, or the tribal governing body identifying . . .

24   ancestors of present members as being descendants of a historical tribe." 25 C.F.R.

25   83.7(e)(1)(iv). It is not immediately clear whether Plaintiffs' committee-approval documents

26   fall into this category. However, the Court need not decide this issue. In order to prevail on

1  their APA claim, Plaintiffs needed to establish that the Department was arbitrary or capricious

2  on all four of the contested criteria. Even assuming that Plaintiffs are correct with respect to

3  criterion 83.7(e), they still fail three of the seven mandatory criteria. The Department is

4  therefore entitled to summary judgment on Plaintiffs' APA claim.

5        **F.**    **Due-Process Claim**

6        Plaintiffs allege that the Department violated their procedural-due-process rights by

7  failing to correctly apply the acknowledgment regulations. Specifically, they claim that the

8  Department failed to "take into account historical situations and time periods for which

9  evidence is demonstrably limited or not available," as required by 25 C.F.R. § 83.6(e), and

10  failed to apply the "reasonable likelihood" standard contained in 25 C.F.R. § 83.6(d).

11        To assert a procedural-due-process claim under the Fifth Amendment, a plaintiff must

12  first establish a constitutionally protected "liberty" or "property" interest. *Board of Regents of*

13  *State Colleges v. Roth*, 408 U.S. 564, 569–70 (1972). A government benefit is not a protected

14  property interest unless the plaintiff has a "legitimate claim of entitlement to it." *Id.* at 577.

15  Plaintiffs do not contend that a petitioning Indian group has a "legitimate claim of entitlement"

16  to being an acknowledged tribe. Instead, they claim that their members have a property interest

17  in various federal benefits that are only available to members of acknowledged tribes. An

18  Indian group can pursue due-process claims on behalf of its individual members if those

19  members were previously receiving individual benefits that were terminated when Congress

20  began conditioning eligibility on tribal status. *Greene v. Babbitt*, 64 F.3d 1266, 1273–74 (9th

21  Cir. 1995). However, Plaintiffs cannot point to any evidence that their members actually

22  received individual benefits that were terminated due to a lack of tribal status. Therefore,

23  Plaintiffs have not established a protected property interest.

24        Even if Plaintiffs had presented such evidence, the Court has concluded that the

25  Department did not err in denying Plaintiffs' petition. The Department properly concluded that

26  the historical circumstances did not explain the significant gaps in the record. The Department

1    also properly concluded that the evidence did not establish a reasonable likelihood that

2    Plaintiffs satisfied the criteria. Because Plaintiffs have not shown that the evaluation of their

3    petition was defective in any way, the Department is entitled to summary judgment on

4    Plaintiffs' due-process claim.

5    **G.    Equal-Protection Claim**

6           Finally, Plaintiffs allege that the Department violated their equal-protection rights.

7    Though their pleadings are difficult to decipher, Plaintiffs appear to allege discrimination on

8    the basis of race and gender. (*See* Dkt. No. 1 at 22–23.) They accuse the Department of using

9    the fact that their ancestors married white settlers as a basis for concluding that the group failed

10   to demonstrate Snohomish descent. They further claim that the Department used the fact that

11   their ancestors were "mixed-blood Indians" as a basis for concluding that they had not

12   maintained ties with the historical Snohomish tribe. Plaintiffs cannot substantiate any of these

13   allegations.

14          First, there is no indication that the Department based its descent analysis on anything

15   other than a person's ancestry. In many instances, the Department noted multiple tribal

16   ancestries for the same individual, but nevertheless classified a family line as "Snohomish" if

17   Plaintiffs could establish *any* Snohomish ancestry for that line. (FD at 136.) However, while

18   Plaintiffs' members descend almost exclusively from Indian women who married white men,

19   Plaintiffs failed to establish a "reasonable likelihood" that these women were Snohomish. The

20   Court is satisfied from the Final Determination that the Department's decision was not based

21   on a failure to meet any blood-quantum threshold; it was based on a failure to meet an

22   evidentiary threshold. The fact that Plaintiffs' ancestors married non-Indians did not affect the

23   analysis.

24          Second, the Department did not treat a person's race as evidence that the person lacked

25   community ties. It is true that close familial relationships often permit an inference of social

26   interaction, but because Plaintiffs' mixed-blood ancestors had white fathers, the Department

ORDER, C08-0372-JCC
PAGE - 21

1   was not prepared to assume that they maintained ties with the Indian side of the family. (*See*

2   FD at 41.) Instead, the Department looked for evidence of *actual* interaction and found that

3   Plaintiffs' ancestors overwhelmingly integrated into non-Indian communities. (*See* FD at 43–

4   45.) The Department even looked for evidence that Plaintiffs' ancestors formed a distinct

5   mixed-blood community but found none. (*See id.*) The denial of Plaintiffs' petition resulted

6   from a failure of proof, not from discrimination.

7            In their Opposition Brief, Plaintiffs appear to set forth an entirely different theory,

8   claiming that the Department violated their equal-protection rights by treating them differently

9   than other similarly situated petitioners. (Dkt. No. 115 at 44.) Specifically, they claim that the

10  Department granted the Samish tribe's petition for acknowledgment despite the fact that the

11  Samish intermarried with whites, did not live on a reservation, and had little evidence of

12  external identifications for substantial periods of time. These facts, however, do not establish

13  that the petitioners are similarly situated. The Department's analysis clearly suggests that an

14  off-reservation entity *could* satisfy the criteria; Plaintiffs simply failed to prove that *their* off-

15  reservation entity satisfied the criteria. Although the Final Determination for the Samish tribe

16  states that there was "little evidence" of external identifications for "substantial periods of

17  time," it is impossible for the Court to conclude from this statement that the two groups are

18  similarly situated. As an initial matter, the Samish petition was evaluated under the 1978

19  regulations, which required petitioners to show substantially continuous identification since

20  "historical times." The 1994 regulations only require identifications since 1900. (*See* FD

21  Summ. at 15 (noting this difference).) It would be reasonable for the Department to demand

22  more frequent identifications in light of the shorter timeframe. More importantly, however, the

23  Proposed Finding for the Samish tribe indicates that the Department found no external

24  identifications during a 15-year period. Plaintiffs, in stark contrast, were unable to produce any

25  external identifications for a 50-year period. The Department was well within its discretion to

26  reach different outcomes for these two petitioners. Although Plaintiffs may perceive

ORDER, C08-0372-JCC
PAGE - 22

1    similarities between themselves and the Samish, they have not demonstrated that the Samish

2    are similarly situated in any relevant respect. Accordingly, the Department is entitled to

3    summary judgment on Plaintiffs' equal-protection claim.

4    **V.      CONCLUSION**

5           For the foregoing reasons, the Court GRANTS Defendants' motion to strike (Dkt. No.

6    100), DENIES Plaintiffs' motion for summary judgment (Dkt. No. 111), and GRANTS

7    Defendants' motion for summary judgment (Dkt. No. 94). The Clerk is DIRECTED to CLOSE

8    the case.

9

10          DATED this 31st day of March 2011.

11

12

13

14

15

16          John C. Coughenour
            UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26

ORDER, C08-0372-JCC
PAGE - 23